**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 16-cv-1961-WJM-MJW

FIRST WESTERN CAPITAL MANAGEMENT COMPANY, a Colorado corporation, and
FIRST WESTERN FINANCIAL, INC., a Colorado corporation,

      Plaintiffs,

v.

KENNETH D. MALAMED,

      Defendant.

---

## ORDER GRANTING PRELIMINARY INJUNCTION IN PART

---

First Western Capital Management Company ("FWCM") and First Western

Financial, Inc. ("First Western Financial") (together, "Plaintiffs") bring this action against

FWCM's former executive, Defendant Kenneth Malamed ("Malamed").  Plaintiffs bring

claims for:

1.    violation of a recently enacted federal statute, the Defendant Trade
    Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(b);

2.    violation of the Colorado Uniform Trade Secrets Act ("CUTSA"), Colo.
    Rev. Stat. §§ 7-74-101 to -110;

3.    breach of an employment contract; and

4.    breach of fiduciary duty.

(*See generally* ECF Nos.  1, 11.)

Currently before the Court is the preliminary injunction portion of Plaintiffs'

Motion for Temporary Restraining Order and Preliminary Injunction.  (ECF No. 13.)[1] The Court held an evidentiary hearing on this motion on September 27, 2016 ("Preliminary Injunction Hearing" or "Hearing").  At the Hearing, the Court heard testimony from Rebecca Cordes, the human resources director for, and an executive vice president at, First Western Financial; Julie Courkamp, First Western Financial's CFO; Scott Wylie, chairman and CEO of both Plaintiffs; and Malamed himself.

At the conclusion of the hearing, the Court issued a preliminary oral ruling granting Plaintiffs' motion in part.  The Court also promised a more detailed written ruling.  This is that ruling.  In light of further reflection on questions raised by the parties following the oral ruling, this ruling differs in small respects from the oral ruling.  **To the extent there is any conflict, this written ruling controls.**

## I.  BACKGROUND

Based on the witness testimony and other evidence received into the record at the Preliminary Injunction Hearing, as well as the parties' filings to date, the Court makes the following factual findings:

### A.    Malamed's Background

Malamed is an attorney and practiced law in California from 1967 to 1969.  In 1969, he switched his career focus and began working as a financial advisor.  He nonetheless maintained an active California law license until 1980, at which point he took inactive status.

In 1985, he founded Financial Management Advisors in Los Angeles, California.

---

[1] The Court previously denied the TRO portion of this motion.  (*See* ECF No. 25.)

Financial Management Advisors primarily served high net worth clients and entities (such as trusts and foundations).

## B.     Plaintiffs' Structure

First Western Financial is a Denver-based holding company for various subsidiaries that operate in the financial services industry.  In 2008, First Western Financial acquired Financial Management Advisors and renamed it First Western Capital Management.  Malamed received at least $5.6 million in this transaction (and had the potential to receive an additional $3 million based on an earn-out provision).

Many of FWCM's sales, marketing, and portfolio management operations are still located in Los Angeles, where Malamed has continued to live and work.  However, corporate control, accounting, and major decisionmaking are all centered in Denver. Denver also controlled hiring and firing of key personnel in the Los Angeles office.

## C.     Malamed's Employment at FWCM

Malamed was a FWCM employee from 2008, when First Western Financial bought Financial Management Advisors, until September 1, 2016, when FWCM terminated him (as described below).  Malamed was FWCM's Chief Investment Officer and, at least for some portion of his employment, a member of its Board of Directors. His day-to-day duties were to develop client business, for which he traveled all over the country.  He also traveled to Denver three or four times a year for executive or board meetings, although he significantly reduced his travel to Denver in 2015 and 2016 due to a health issue that is aggravated by Denver's altitude.

For the first three years of his tenure at FWCM (spanning 2008–11), Malamed operated under a written employment agreement.  That employment agreement, as

well as the asset purchase agreement by which First Western Financial acquired

Financial Management Advisors, contained provisions prohibiting Malamed from

competing with Plaintiffs, should he depart or be terminated.

From the end of that employment agreement through August 2013, Malamed

continued to work for FWCM as an at-will employee.  Effective August 16, 2013,

Malamed entered into a new written employment agreement ("Employment

Agreement") with a three-year term.

At the Preliminary Injunction Hearing, the parties raised many questions about

the proper interpretation and validity of certain portions of the Employment Agreement.

Those questions are not strictly relevant to whether a preliminary injunction should

issue because the protections of the DTSA and CUTSA do not turn on the validity of

any employment contract.  Nonetheless, the Employment Agreement is relevant to

certain narrower issues that arise below.  The Court therefore notes the following.

Under the Employment Agreement, Malamed's salary was set at $500,000 per

year plus potential bonuses.  (PX 1 § 5(a), (b).)[2]  Malamed also received an "allowance

payment" of $15,000 per month toward a loan he had received from another First

Western Financial subsidiary.  (*Id.* § 5(g).)  In other words, part of Malamed's

compensation was that FWCM would pay down his loan.

Among many other things, the Employment Agreement requires Malamed to

preserve company trade secrets "indefinitely and perpetually."  (*Id.* § 11(f).)  Malamed

_____

[2] "PX" refers to Plaintiffs' exhibits submitted at the Preliminary Injunction Hearing, all of which the Court admitted into evidence.  Similarly, "DX" refers to Malamed's exhibits, all of which were likewise admitted.

must also return any trade secrets to the company, upon demand, and may not retain copies in any form.  (*Id.* § 11(e).)

The Employment Agreement additionally imposes a two-year noncompete obligation in the "Prohibited Industry," meaning "investment management, trust services, banking, family office, financial planning or insurance services."  (*Id.* § 12(a)–(b).)  The noncompete agreement specifically extends to soliciting FWCM's "past, present or possible future customers" for those two years.  (*Id.* § 12(c)(1).)  And the Employment Agreement contains a reformation clause, stating that the noncompete obligations may be judicially reformed to the extent necessary to preserve their validity. (*Id.* § 13.)

The Employment Agreement further contains a forum selection clause, requiring any disputes to be adjudicated in Denver, and without a jury.  (*Id.* § 15.)  According to the Employment Agreement, Colorado law governs said Agreement "without reference to any jurisdiction's law on conflicts of law."  (*Id.* § 21.)

D.     **"CRM"**

FWCM maintains a database referred to as "CRM"—which, depending on who you ask, stands for "client relationship management" or "contact record management." In either event, CRM is a contact list of FWCM clients and potential clients.  The various witnesses described it as an "add-on" to Microsoft Outlook.  There is some question whether CRM is itself password-protected (*i.e.*, a user must enter a password when trying to access that feature in Outlook), or whether CRM is password-protected only in the sense that Outlook is password-protected, or whether a particular employee's login credentials automatically make CRM available or not depending on the employee's

needs, or something else.  Nonetheless, it is undisputed that CRM is not publicly accessible.  Moreover, Cordes (human resources director) and Courkamp (CFO) both testified that their passwords do not grant them access to CRM.

In addition, each year as a precondition of enrolling in benefits, every FWCM employee must acknowledge that they have read FWCM's Code of Ethics.  The Code of Ethics states that "[a]ll information regarding First Western Capital Management's clients is confidential" and "may only be disclosed when the disclosure is consistent with the firm's policy and the client's direction."  (PX 18 at 8.)  "[A] person's status as a client" and "advice provided by the Firm to clients" is specifically deemed to be confidential client information.  (*Id.*)

Plaintiffs did not produce a specific record of Malamed acknowledging the Code of Ethics on a yearly basis.  However, Cordes testified that Malamed received benefits every year, and therefore must have acknowledged the Code of Ethics each year.

## E.    "Company A," Helmy, and the CRM Printout

Sometime in the first quarter of 2016, Plaintiffs began discussing the possibility of selling FWCM to another company.  Plaintiffs narrowed the list of potential buyers to three companies, referred to at the Preliminary Injunction Hearing as Companies A, B, and C, respectively, to preserve the sensitive nature of the business discussions involved.  Given that a sale of FWCM would affect Malamed personally, and would also affect another FWCM board member based in Los Angeles, this process was handled by a special committee comprising the three other FWCM directors, all of whom were Denver-based and were apparently deemed to be non-conflicted in the transaction.

The special committee found Company A to be the most promising and focused

6

its efforts there.  Malamed somehow learned of this and expressed his displeasure with Company A.  This disagreement somehow led to a June 14, 2016 meeting between Malamed and certain other senior FWCM officers.  At that meeting, Malamed expressed his opinion that the noncompete clause in his Employment Agreement was unenforceable, at least after the Employment Agreement's expiration on August 16, 2016.

The evening of that same day, Malamed sent an e-mail to Sue Helmy, a contractor working as Malamed's secretary through a temp agency.  Malamed sent this e-mail to Helmy's personal e-mail account, however, not to the FWCM e-mail account that the company had provided for her.  The subject line of the e-mail was "Client book." In the body of the e-mail, Malamed tersely requested Helmy to "have 3 copies printed.  I will reimburse you."  (PX 9.)  At the Preliminary Injunction Hearing, Malamed admitted that reimbursement would not have been necessary if Helmy had made these copies on FWCM's equipment, but he "didn't instruct her to do that"—*i.e.*, he did not instruct her to make copies on FWCM's equipment.

Helmy responded, "What?  Where is it??"  Malamed replied, "What you put on the disc.  Client info."  Helmy then closed the e-mail string by saying, "Oooooo. Sure."

Malamed claims that Helmy made three copies, as instructed, and left two of them at his FWCM office, which he has since never seen.  He admits he took home the third copy, but allegedly never looked at it.  What this document actually contained is described in Part II.H, below.

The contents or whereabouts of the "disc" referred to in the e-mail remain unknown.  When asked at the Preliminary Injunction Hearing about it, Malamed said he

could not remember what he was referring to, that he does not "really know what a disk is," and that he is not "sufficiently computer literate" to use disks, which is why he requested printouts.

## F.   Termination

Around the same time that Malamed obtained the printout, and perhaps prompted by Malamed's disavowal of the noncompete provisions in his Employment Agreement, FWCM began monitoring Malamed's company e-mail account.  Because Malamed sent his e-mail to Helmy from his company account, FWCM learned about his actions soon after they happened.

On August 2, 2016, Plaintiffs filed this lawsuit, but did not inform Malamed.  At the Hearing, Wylie testified that the company felt it needed to file the lawsuit to secure a Colorado forum in light of Malamed's views regarding the enforceability of his Employment Agreement.

Malamed's Employment Agreement expired on August 16, 2016, but he remained an at-will employee of FWCM.  FWCM began discussing a new employment agreement, but various frustrations came to a head by the end of that month.  On September 1, 2016, FWCM terminated Malamed and asked him to return all trade secrets, including whatever Helmy had printed for him.  (PX 2.)

## G.   Post-Termination Events

FWCM alleges that, immediately upon being fired, Malamed allegedly began soliciting FWCM's clients.  "FWCM has already lost approximately $225,000 in annual revenue from 13 longtime FWCM clients who have taken steps to sever their relationships with FWCM, closing 22 accounts a total market value of approximately

$32 million." (*Id.* at 8.)  Malamed responds that all of these clients found out about his termination independently, and also independently chose to leave FWCM so they could continue to have their money managed by him.  Malamed submits declarations (which the Court admitted into evidence) from six clients confirming that they learned of his termination from some other source and have withdrawn their money from FWCM (or plan to) so that Malamed can continue to manage it.  (DX A, B, D, E, F, G.)

Malamed is currently 73 years old.  He claims, "If I am not allowed to continue to work as a financial advisor or receive unsolicited business from my former clients, my career since 1969 will be over.  I will not have the ability to meet my personal and financial needs or obligations."  (ECF No. 28-1 ¶ 28.)  At the Hearing, the Court asked Malamed to explain how this could be the case considering his age and obvious financial success over many years.  Malamed responded that a settlement in a prior lawsuit left him with a multimillion dollar debt that, apparently, wiped out his personal savings and requires him to continue to work.

## H.     The Contents of the Printout

Shortly after being served with the complaint in this lawsuit, Malamed turned over to his attorney what he claims to be the only copy of the material that Helmy printed for him in June 2016.  For convenience, the Court will refer to this as the "Printout."  The Court ordered Malamed's attorneys to produce, prior to the Hearing, an exact and complete copy of the Printout to the Court and to Plaintiffs.  (*See* ECF Nos. 31, 34; *see also* PX 13.)

The Printout is 130 pages long.  The first 107 of the 130 pages are a tabular list of names and contact information for roughly 5,000 FWCM contacts.  The parties agree

that this information came from CRM.  Among these 5,000 names, FWCM has

confirmed that 331 are current clients.  About half of that 331 are clients that FWCM

obtained by virtue of acquiring Financial Management Advisors; the remaining half are

clients that came to FWCM after the acquisition.

The remaining 22 pages of the Printout were not from CRM, and comprise

printed versions of various spreadsheets.  These spreadsheets contain names of

clients, the total market value of their holdings under management, the management

fee being charged by FWCM, and similarly sensitive information.  They also contain a

list of clients sorted by the FWCM manager in charge of servicing those accounts.

At the Preliminary Injunction Hearing, Malamed testified that he asked for the

first 107 pages (the CRM data) in June 2016 because he began to fear for his job and

CRM was essentially his address book for the last 40 years.  He claims that he would

not know the contact information even for some of his family members without access

to CRM.  As for the final 22 pages, Malamed denies knowing how Helmy obtained that

information or why she included it in the Printout.

## II.  CREDIBILITY DETERMINATIONS

As these preliminary injunction proceedings played out, the Court determined

that a significant portion of the relevant considerations would turn on the various

witnesses' credibility.  It is therefore appropriate, before proceeding further, to state the

Court's credibility findings after closely observing the testimony and demeanor of each

witness.

The Court found no reason to doubt the credibility of Cordes, Courkamp, and

Wylie.  Cordes and Courkamp in particular presented straightforward, precise factual

10

testimony with no hint of embellishment, and their cross-examinations revealed no material weaknesses.  Wylie was more combative and made little effort to conceal how upset this incident has made him, but the Court nonetheless found no basis to doubt any of his material factual assertions.

Malamed, unfortunately, is a different story.  The Court on several occasions found his statements and explanations difficult to believe.  The following examples, some of which have already been mentioned above, are illustrative:

**1.**  Malamed claimed that he is not computer literate enough to know how to use a disk, yet he later testified to a clear understanding of CRM and that he would personally enter business card information into that database.  He also understood the difference between sending e-mails to Helmy's work address and personal address. This displays at least enough computer literacy to make it unlikely that he somehow has failed to learn, in his 40+ years in an IT-heavy industry, how to use a disk.

**2.**  Even when looking at his own e-mail mentioning "client info" placed by Helmy on a "disc," Malamed could not remember what he was referring to.

**3.**  Malamed had no idea how the last 22 pages of the Printout—the most sensitive information in that document—came to be a part of the Printout.  He offered no explanation for how his secretary—a temp contractor—would somehow know where to find those 22 pages, nor why she would include them of her own accord.

**4.**  When asked at the Hearing if the last 22 pages was "highly sensitive client information," Malamed responded, "No."

**5.**  During extensive testimony regarding the circumstances leading up to the Employment Agreement, Malamed repeatedly stated that First Western Financial's

11

former CEO, Warren Olsen, told Malamed that he "shouldn't worry" about the noncompete and Colorado choice-of-law provisions, and Malamed "relied" on that—even though he is himself a lawyer and should understand that oral representations which flatly contradict the written terms of a contract are very difficult to enforce.

**6.**   When asked why he did not call Warren Olsen to testify in support of his story, Malamed claimed that he was acting according to the instructions in his employment termination letter not to have contact with a company associated with Olsen.  However, Malamed obviously felt no need to heed the termination letter's other instructions, such as returning the Printout to Plaintiffs.

**7.**   During the hearing, Malamed insisted that his understanding of the Employment Agreement was that all of its obligations expired on August 16, 2016, even though the Employment Agreement plainly states that certain provisions (such as the noncompete provision) survive the Agreement's termination.  (*See* PX 1 § 9.)  Malamed appears to be making a distinction between "termination" and "expiration," and claiming that "expiration" carries with it no continuing obligations—an interpretation that the undersigned has never encountered in 30+ years of legal practice, including significant practice in the employment field.

**8.**   In light of Malamed's termination/expiration distinction and his insistence that not even the most sensitive 22 pages of the Printout could be considered trade secret information, the Court posed to Malamed a hypothetical situation in which FWCM possesses a proprietary trading algorithm that "no one could dispute was a true trade secret. . . . Is it your testimony that your obligation to keep that algorithm secret would

have expired in mid-August 2016?"  Malamed's response deserves to reprinted in full,

given the evasion it displays:

> A.    That's a very interesting hypothetical question.  I would think—my thoughts of what makes up a trade secret would include something like you just suggested, Your Honor.  I never really gave that any thought since we don't have anything like that.  I guess that yes, something like that—I felt the agreement was over when it was over, so I guess my—I guess my hypothetical answer to that, after thinking that through—

> Q.    I don't want a hypothetical answer.

> A.    Sorry, I don't—I mean an answer to your hypothetical question—

> Q.    All right.

> A.    —is that I thought the contract was over on August 16th.

> Q.    So what's the answer to my question?

> A.    So the answer to your question is I don't think I would have thought that that was subject to a trade secret.

> Q.    So that this proprietary trading algorithm in my hypothetical that First Western had treated as secret, in your view on the 17th of August of 2017, you could have disclosed to Fidelity Investments?

> A.    I—you know, no.  I don't—that's—that is not the way I've lived my life and something like that would be subject to—much less of anything else, it has nothing to do with the contract.  That's a proprietary— something proprietary, I would not have been able— should be able to share.

All of these examples, and others, lead this Court to conclude that Malamed has

become willing to make statements or take positions with reference to what he believes

will prevent liability in this case.  Accordingly, the analysis below proceeds under the assumption that Malamed's testimony in most cases is not trustworthy.

### III.  REQUESTED INJUNCTION

First Western requests a preliminary injunction:

1.     "restraining and enjoining Malamed from contacting, soliciting, or otherwise offering or providing financial services to FWCM's existing and prospective clients . . . .";

2.     "requiring that Malamed preserve all materials (including electronic and hard copies) related to his employment with FWCM and/or communications with FWCM clients, including but not limited to emails on his personal account and text messages on his cellular phone(s)"; and

3.     "[requiring Malamed to] return to FWCM all FWCM trade secrets in his possession, including all electronic and hard copies of FWCM's client book."

(ECF No. 13 at 18.)

Notably absent is any request for specific performance of the noncompete and nonsolicitation provision in the Employment Agreement (which would effectively bar Malamed from the financial services industry for two years).  In briefing and at the Preliminary Injunction Hearing, Plaintiffs repeatedly emphasized that they only seek to prevent Malamed from competing for or servicing FWCM's clients because, whether or not he still retains any version of the Printout, his accumulated "inside knowledge" includes trade secrets and provides him a competitive advantage that can only be nullified by the requested injunction.

14

## IV.  LEGAL STANDARD

To prevail on a motion for preliminary injunctive relief, Plaintiffs have the burden

of establishing that four equitable factors weigh in their favor: (1) they are substantially

likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is

denied; (3) their threatened injury outweighs the injury the opposing party will suffer

under the injunction; and (4) the injunction would not be adverse to the public interest.

*See Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009); *Gen. Motors

Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).  However, the Tenth

Circuit also approves of a

> modified . . . preliminary injunction test when the moving
> party demonstrates that the [irreparable harm], [balance of
> harms], and [public interest] factors tip strongly in its favor.
> In such situations, the moving party may meet the
> requirement for showing [likelihood of] success on the merits
> by showing that questions going to the merits are so serious,
> substantial, difficult, and doubtful as to make the issue ripe
> for litigation and deserving of more deliberate investigation.

*Verlo v. Martinez*, 820 F.3d 1113, 1128 n.5 (10th Cir. 2016).  In this case, however, the

Court finds that the traditional preliminary injunction standard suffices to resolve the

issues at hand.

## V.  ANALYSIS

### A.    Likelihood of Success on the Merits

The Court finds that Plaintiffs' request for an injunction can be resolved solely

with reference to Plaintiffs' claims for violation of the DTSA and CUTSA.  The analysis

below therefore focuses on those statutes, although certain contractual questions creep

in by virtue of how these statutes are worded.

15

1.    Is Malamed Competing for FWCM's Business, Or Is There a Legitimate Threat of Such Competition?

Plaintiffs' motion rests on the idea that Malamed is stealing business from FWCM, or that he intends to.  The evidence the Court has received thus far supports Malamed's position that those clients who have left FWCM after his termination did so of their own accord, and not because Malamed affirmatively solicited their business.

Nonetheless, at the Hearing, Malamed would not deny his intent to seek employment at another financial management firm and then seek to service FWCM clients.  Malamed also denied that the Printout contained anything that FWCM could deem a trade secret.  He also claims he could use public sources or his own memory to recreate a client list similar to that contained in the Printout.  (ECF No. 28-1 ¶ 36.)

Malamed was also demonstrably loose with the real names of Company A and Company B, which the parties have striven to keep secret, including through specific efforts at the Hearing (all of which Malamed attended).  Notwithstanding, in his testimony Malamed repeatedly used those companies' real names, including after being reminded by his own counsel not to do so.  He even displayed some flippancy regarding the pseudonyms, suggesting in a wink-and-nod tone that Company B should actually be referred to by a different letter of the alphabet (for reasons the Court cannot explain without potentially revealing the identity of Company B).

This evidence is sufficient for preliminary injunction purposes to convince the Court that Malamed does not consider his knowledge of Plaintiffs' client information to be a trade secret, and that he will use it to compete with Plaintiffs if not enjoined. Moreover, such competition could be substantial, even if he never actively solicits a

FWCM client.  For example, Malamed likely remembers at least some of the management fee percentages charged to various clients, or categories of clients. Therefore, without making any explicit comparison to FWCM, he can offer management fees that are, say, a quarter of a percent lower than what he knows the individual was paying at FWCM, and thereby entice the client—who almost certainly would recognize that he or she was being offered a discount as compared to FWCM.

Thus, a real threat exists that, absent an injunction, Malamed will use his knowledge gained while at FWCM to compete with FWCM for its clients.

2.   Does Malamed's Knowledge Include Trade Secrets?

The DTSA defines "trade secret" as follows:

> the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

CUTSA contains a similar definition but also explicitly identifies any "listing of names, addresses, or telephone numbers, or other information relating to any business

or profession which is secret and of value" as a trade secret.  Colo. Rev. Stat.

§ 7-74-102(4).  CUTSA, like the DTSA, also requires that the owner of the trade secret

"must have taken measures to prevent the secret from becoming available to persons

other than those selected by the owner to have access thereto for limited purposes."

*Id.*

Under these definitions, Malamed's knowledge qualifies as a trade secret.  First,

a compilation of wealthy individuals willing to consider the sorts of financial

management services that FWCM provides, much less to hire FWCM, is a valuable

asset.  Such a list in the hands of a competitor could save the competitor at least some

time in looking for worthwhile prospects as compared to, for example, cold-calling

individuals employed in high-paying professions.

Malamed claims he no longer has such a list.  Although the Court has reason to

disbelieve Malamed, the Court makes no finding either way at this time.  It is enough

that Malamed remembers the names of many FWCM clients, and that he can look up

their contact information.  Furthermore, as noted, he almost certainly remembers far

more than the identity of clients.  It would be difficult to conceive of him *not*

remembering most clients' management fee percentage, or at least to have a good

guess.  Malamed also likely remembers many clients' preferences regarding risk, time

horizon, communication style, and so forth.  He may also remember, at least roughly,

how much money some clients have entrusted to FWCM.  All of these are informational

assets that, in the financial management industry, a competitor would find especially

valuable.  Thus, the Court finds that Malamed, at a minimum, remembers trade secret

information, even if he does not possess any trade secrets in physical or digital form.

18

Malamed challenges whether FWCM kept this sort of information secret. However, at the Hearing, Plaintiffs' witnesses testified that CRM is password-protected in some form, and that FWCM does not publicly disclose its clients. Indeed, testimony at the Preliminary Injunction Hearing quite clearly established that FWCM blocks access to CRM by its own employees—including high-level executives of the company like Cordes and Courkamp—who do not have a need to know the information contained therein. The Court finds that this is sufficient to satisfy the DTSA's and CUTSA's requirement that the company take measures to prevent public access. As for information regarding assets under management, each client's management fee percentage, and similar data, there was no evidence that this information is publicly disclosed or that FWCM treated it as anything but confidential.[3] Thus, the Court finds that Malamed's knowledge includes FWCM's trade secrets for purposes of the DTSA and CUTSA.

3.     Are Plaintiffs Incurring Damages?

Malamed has not disputed Plaintiffs' assertion that at least 22 account have been closed, creating a loss of at least $225,000 in annual revenue. Malamed also does not dispute that these accounts were closed by individuals intending to work with him. Plaintiffs are therefore incurring damages.

---

[3] There was limited testimony at the hearing regarding public disclosure of fees as part of meeting regulatory requirements. The Court has received no briefing on these regulatory requirements, and particularly whether they are any different from the "rack rate" approach (*i.e.*, disclosing the highest possible rate). In any event, the Court has examined the Printout. The fee percentages charged are not entirely uniform, even among similarly situated clients.

4.      Can the Court Grant an Injunction Under the DTSA?

        a.      *"Evidence of Threatened Misappropriation"*

Under the DTSA, the Court cannot grant an injunction that "prevent[s] a person from entering into an employment relationship," and the Court can only place conditions on employment "based on evidence of threatened misappropriation and not merely on the information the person knows."  18 U.S.C. § 1836(b)(3)(A)(i)(I).  Malamed is not currently employed, so an injunction would not—at the present time—prevent him from entering into an employment relationship or place restrictions on his employment. However, if the Court grants an injunction as requested by Plaintiffs, it would operate as a restriction on his activities with any future employer.  Thus, the Court finds that this portion of the DTSA applies.  For the reasons already discussed, however, there is sufficient evidence that Malamed will use FWCM's trade secrets to develop his own business, either under his own name or on behalf of some new employer.  Thus, the court finds that there is "evidence of threatened misappropriation" as required by the DTSA.

        b.      *"Conflict With an Applicable State Law"*

The DTSA also forbids an injunction that would "conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business."  *Id.* § 1836(b)(3)(A)(i)(II).  This leads the court into the "choice-of-law bramble," *Salt Lake Tribune Publ'g Co., LLC v. Mgmt. Planning, Inc.*, 390 F.3d 684, 692 (10th Cir. 2004), because the parties hotly contest whether the "applicable State law" comes from Colorado or California.

The parties' choice-of-law arguments are presented through the lens of the

Employment Agreement, *i.e.*, whether the Employment Agreement should be governed by Colorado law, as specified in its choice-of-law clause.  However, that is not necessarily the proper perspective.  The question is the "applicable State law" for evaluating "restraints on the practice of a lawful profession, trade, or business" that often flow from trade secret injunctions.  18 U.S.C. § 1836(b)(3)(A)(i)(II).  Although misappropriation of trade secrets may be a contractual violation in individual cases, neither the DTSA nor CUTSA turn on the existence of a contract.  Trade secret misappropriation is therefore more akin to a tort, and the choice-of-law issues should be analyzed under the tort framework.  *Cf. SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1511–12 (10th Cir. 1990) (analyzing trade secret choice-of-law question by applying tort choice-of-law principles from the Restatement (Second) of Conflict of Laws).

As a federal court sitting in Colorado, the Court must apply Colorado choice-of-law principles to this question.  *Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F. Supp. 1048, 1049 (D. Colo. 1985).  Colorado follows the Restatement (Second) of Conflict of Laws ("Restatement") for tort claims.  *First Nat'l Bank v. Rostek*, 514 P.2d 314, 320 (Colo. 1973).  Under the Restatement, the Court must locate the state with "the most significant relationship to the occurrence and the parties under the principles stated in § 6."  Restatement § 145(1).  The cross-referenced principles are as follows:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

21

> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

*Id.* § 6(2).  Moreover,

> [c]ontacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* § 145(2).  In considering all of these factors, the Court finds the following especially

pertinent.

First, to the extent an injunction is employed as a means of protecting trade

secrets, Colorado and California law are congruent.  California, through case law, has

determined that California's statutory noncompete restrictions nonetheless permit "an

injunction against a former officer . . . [to] protect confidential customer lists and other

trade secrets."  *Thompson v. Impaxx, Inc.*, 7 Cal. Rptr. 3d 427, 430 (Ct. App. 2003); *see

also* Cal. Bus. & Prof. Code §§ 16600, 16601.  And Colorado's statute regarding

noncompete provisions explicitly allows such provisions in "[a]ny contract for the

protection of trade secrets."  Colo. Rev. Stat. § 8-2-113(2)(b).  As noted, the validity of

Malamed's noncompete obligation in his Employment Agreement is not directly at issue in these preliminary injunction proceedings.  However, California's and Colorado's parallel approaches to trade secrets in noncompete agreements are the "relevant policies" of the two potentially interested forums for purposes of the Restatement § 6, and those policies do not conflict.  Rather, both permit trade secret protection in the present circumstances.

Second, FWCM is a Colorado-headquartered firm, most major business decisions are made in Colorado, and it is where the alleged injury will be primarily felt.

Third, on matters as significant as trade secret protection, "certainty, predictability and uniformity of result," and "ease in the determination and application of the law to be applied," Restatement § 6(f)–(g), are of heightened importance.  FWCM deserves to know, before entrusting trade secrets to its employees, whether it can validly protect those trade secrets if the employees reside outside of Colorado.  Indeed, Wylie testified that the Employment Agreement was drafted, in part, to ensure such predictability.

Fourth, Colorado was the center of the parties' relationship in this matter.  Not only was control over FWCM exercised from Colorado, but the parties entered into the Employment Agreement, which states that it is governed by Colorado law.  The parties dispute whether that choice-of-law clause is valid, but the Court finds that Plaintiffs are at least likely to succeed in proving its validity.  The choice-of-law clause states that Colorado law applies "without reference to any jurisdiction's law on conflicts of law." (PX 1 § 21.)  It appears Colorado courts have never faced the question of whether a "without reference" clause such as this one actually circumvents the choice-of-law

23

analysis.[4]  This Court predicts that Colorado would enforce this clause as written in the present circumstances.  More specifically, the Court predicts that the Colorado Supreme Court, if faced with this question, would inquire whether the parties are of roughly equal bargaining power, whether the contract is a consumer adhesion contract, and so forth.  *See* Restatement § 187 cmt. b ("the forum will scrutinize [adhesion] contracts with care and will refuse to apply any choice-of-law provision they may contain if to do so would result in substantial injustice to the adherent").  Assuming these inquiries raise no concerns, Colorado would enforce the choice-of-law clause, including the "without reference" clause, as written.  To do otherwise would permit even the most sophisticated parties to thwart contractual expectations.  *Cf. Am. Exp. Fin. Advisors, Inc. v. Topel*, 38 F. Supp. 2d 1233, 1239 (D. Colo. 1999) ("protection of the parties' expectations is a central policy underlying Colorado's law of contracts").  Here, Malamed is an accomplished and sophisticated businessman and lawyer, and he was represented by his own counsel during negotiations of the Employment Agreement.  Thus, Plaintiffs are likely to succeed in enforcing the Colorado choice-of-law provision, thereby demonstrating an additional reason to view the parties' relationship as centered in Colorado.

Against all this is the fact that Malamed has long lived and worked in California and any business he is unable to generate due to an injunction will be a loss to him in

---

[4] It appears to be a little-addressed question throughout the country.  *Compare OrbusNeich Med. Co., BVI v. Boston Sci. Corp.*, 694 F. Supp. 2d 106, 113 (D. Mass. 2010) (with little analysis, relying on "without reference" clause to avoid choice-of-law analysis), *and Procter & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270, 1288 (S.D. Ohio 1996) (same), *with Swanson v. Image Bank, Inc.*, 77 P.3d 439, 441–42 & n.2 (Ariz. 2003) (with little analysis, rejecting argument that "without reference" clause obviates choice-of-law analysis).

that state.  In addition, the evidence before the Court suggests that many current FWCM clients who wish to continue working with Malamed also reside in California. However, as already noted, California enforces trade secret protections in a similar manner as Colorado.  Thus, these injuries would likely be felt in California even if California law applied.

The Court therefore finds that the "applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business," 18 U.S.C. § 1836(b)(3)(A)(i)(II), is Colorado's statute governing noncompete provisions.  As discussed above, that statute permits noncompete provisions to protect trade secrets.  Thus, an injunction that accomplishes the same result as a noncompete provision is permissible under the DTSA.

5.     Can the Court Grant an Injunction Under CUTSA?

CUTSA likewise permits injunctive relief: "Temporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or threatened misappropriation of a trade secret."  Colo. Rev. Stat. § 7-74-103.  This is more generic than the DTSA, particularly in that it contains no reference to potential conflicts with statutes governing noncompete agreements.  However, the Court is comfortable in presuming that one may not, through an injunction, obtain an employment restriction that one may not obtain through an employment contract.  Nonetheless, Colorado's statutory restrictions on noncompete agreements (discussed above) would permit restrictions needed to protect trade secrets.  Accordingly, an injunction under CUTSA is appropriate.

**B.    Irreparable Harm**

1.    <u>Did Plaintiffs Delay Too Long?</u>

At the Preliminary Injunction Hearing, Malamed's counsel pursued several lines of inquiry suggesting that Plaintiffs had delayed too long in bringing their request for injunctive relief.  Delay in seeking relief counsels against finding that the plaintiff faces irreparable harm.  *See GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).  However, the Court finds no undue delay here.

First Western's complaint, filed August 2, 2016, demonstrates that as of sometime before that date, First Western knew of Malamed's allegedly unauthorized conversations with other companies potentially interested in acquiring FWCM, and of Malamed's after-hours efforts to obtain a copy of the "client book."  (ECF No. 11 ¶¶ 24–30.)  In addition, First Western knew of Malamed's opinion regarding the enforceability of the noncompete provision (ECF No. 13 at 6), and also that he did not intend to renew the Employment Agreement when it expired on August 16, 2016 (ECF No. 11 ¶¶ 27, 32).  In other words, as early as June 14 of this year, First Western had reason to believe that Malamed would begin competing against the company as of mid-August.

However, Wiley testified that until the end of August, he remained hopeful that FWCM could reach a new agreement with Malamed.  In addition, FWCM did not actually start losing money allegedly at Malamed's hands until after he was terminated on September 1.  The instant motion was filed on September 12, 2016.  The Court finds no undue delay.

2.     Must Plaintiffs Demonstrate Actual Harm?

In the Tenth Circuit, the irreparable harm requirement is excused when the evidence shows that a defendant is or will soon be engaged in acts or practices prohibited by statute, and that statute provides for injunctive relief to prevent such violations.  *See Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651 (10th Cir. 2004); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001); *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981).  This precedent was cited by Plaintiffs in their motion (*see* ECF No. 13 at 15), but Malamed's response did not address it (*see generally* ECF No. 28).  The Court therefore gave Malamed's counsel a chance to respond during the Preliminary Injunction Hearing, but counsel only referred to the Court to *Xantrex Technology Inc. v. Advanced Energy Industries, Inc.*, 2008 WL 2185882 (D. Colo. May 23, 2008), a case from this District in which the Honorable Wiley Y. Daniel applied *Star Fuel* to find that "a showing of irreparable harm is unnecessary," but "[n]onetheless" chose to conduct a traditional irreparable harm analysis.  *Id.* at *14–15.  *Star Fuel* does not require such alternative analyses, and the Court will not conduct one here.

Because both the DTSA, 18 U.S.C. § 1836(b)(3)(A), and CUTSA, Colo. Rev. Stat. § 7-74-103, provide for injunctive relief to prevent misuse of trade secrets, irreparable harm presumptively exists if Malamed has misused, or is likely to misuse, trade secrets.  As noted, the Court has found that Malamed is misusing or threatening to misuse trade secrets regarding FWCM clients.  Thus, the Court finds under Tenth Circuit case law that irreparable harm presumptively exists and need not be separately

established.[5]

Nonetheless, on this record, the Court finds that an injunction extending to those clients who have already departed to work with Malamed, or that have taken definite steps to do so, would not repair or prevent any harm to Plaintiffs. The Court has received no evidence that these clients would return to FWCM in any event. Accordingly, an injunction preventing Malamed from servicing these clients would simply be punitive, rather than remedial. Therefore, these clients will be excepted from the injunction, as described further below.

## C.    Balance of Harms

On this record, there is no dispute that Plaintiffs stand to lose at least $225,000 in annual revenue (management fees, the Court presumes) from clients who have already left on account of Malamed's termination. If additional clients leave for the same reasons, Plaintiffs will lose more money.

Balanced against this is Malamed's claim that he cannot meet his obligations if he cannot work as a financial advisor. Although the Court suspects that Malamed may be exaggerating the financial straits he claims to be facing, the Court finds him

---

[5] The Court notes for the record that, but for *Star Fuel* and its predecessors, the Court would not have found irreparable harm, and instead would have determined that, to the extent Plaintiffs prevailed on their claims, money damages that could be reasonably quantified and paid as a judgment at the close of the case would have adequately made Plaintiffs whole. Moreover, there are fair grounds to suspect that the injunction Plaintiffs seek might actually cause them more harm than otherwise because clients may leave out of spite when they learn that Plaintiffs obtained a court order preventing Malamed from continuing as their financial advisor. Finally, later Supreme Court precedent—particularly *Winter v. NRDC*, 555 U.S. 7 (2008), and *eBay v. MercExchange*, 547 U.S. 388 (2006)—strongly suggests that no element of the injunction test should be presumed, thus calling the *Star Fuel* line of precedent into doubt. But the Tenth Circuit has not repudiated that line of precedent, nor has any Supreme Court case overruled it explicitly or by clear implication. The Court therefore is bound to follow it.

generally credible on this issue given the facility with which he was able to provide a detailed answer to the Court's question in this regard.

Nonetheless, Plaintiffs do not seek to prevent Malamed from working as a financial advisor.  They only seek to prevent him from servicing FWCM's clients.  Moreover, Malamed has a record of developing lucrative business.  Even if the Court grants Plaintiffs' requested injunction, Malamed will still be able to solicit new business for himself (or whatever firm may join).  And, as just explained, the injunction the Court will actually issue contains some exceptions even for FWCM clients.  Accordingly, the balance of harms favors FWCM.

## D.    Public Interest

Plaintiffs claim that the relevant public interest is the public policy in favor of protecting trade secrets.  (ECF No. 13 at 16–17.)  Malamed claims that the public interest is all of the other clients who want to work with him—although that is really a balance of harms argument.  (ECF No. 28 at 8.)  In other words, as the arguments have been presented by the parties, only Plaintiffs have articulated a public interest.  The Court agrees with Plaintiffs that the relevant public interest is protection of trade secrets, which will be furthered by an injunction.

Thus, Plaintiffs have satisfied all four preliminary injunction factors.

## F.    Bond

This Court must normally impose a bond on Plaintiffs as a condition of preliminary injunctive relief.  *See* Fed. R. Civ. P. 65(c).  Given the financial stakes of this litigation, the Court finds that a substantial bond is necessary.  The Court will therefore set a bond of $1 million.  This bond is calculated under the assumption that,

should Plaintiffs eventually fail on the merits, Malamed will have been deprived of at least two years of compensation that he might otherwise have expected.  Before his termination, Malamed's base annual salary was $500,000.  Thus, the Court sets a bond of $1 million.

## VI.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  The preliminary injunction portion of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 13) is GRANTED IN PART;

2.  Conditioned upon Plaintiffs posting with the Court a bond of **$1,000,000.00** and providing the Court appropriate notice thereof on or before **October 14, 2016**, Defendant is PRELIMINARILY ENJOINED as follows:

    a.  For purposes of this injunction:

        i.  "Effective Date and Time" means September 27, 2016, at 6:00 p.m. (MDT);

        ii.  "Excepted Clients" means Rich Isaacson, Ray Fisher, Barry Russell, Herbert F. Gelfand, Eric Wanger, and Laurie Gelfand;

        iii.  "FWCM Client" means any individual or entity (1) that was assigned a Portfolio Number by First Western Capital Management on or before the Effective Date and Time; and (2) from whom, at least once in the 365 days following to the Effective Date and Time, First Western Capital Management intends to collect, in the ordinary course of business, a fee in return for management of that individual's or entity's assets;

30

iv.   "Other Intended Departures" means any FWCM Client that (1) is listed as assigned to "Ken" on Plaintiffs' Exhibit 13, exhibit page 119; and (2) between September 1, 2016 and the Effective Date and Time (inclusive), closed their FWCM account or expressed by word or action (such as a directive to halt trading) an intent to close their FWCM account or to otherwise withdraw FWCM's authority to administer their assets, under the belief that they could then appoint Kenneth Malamed to manage those assets through a different firm;

b.   Defendant Kenneth Malamed, his agents, and all those actively in concert with him, are enjoined from soliciting business from, or otherwise competing for the business of, any FWCM Client; and are likewise enjoined from accepting business offered from any FWCM Client **other than** the Excepted Clients and Other Intended Departures;[6]

c.   This injunction will expire on the earlier of: further order of this Court dissolving the injunction; the entry of a permanent injunction, if any; the date of favorable disposition in favor of Malamed (meaning the date on which Plaintiffs' deadline to appeal as of right from an unfavorable judgment has expired; or the date on which the mandate issues from an unsuccessful appeal by Plaintiffs, assuming Plaintiffs posted a

---

[6] Although the Court excludes the Excepted Clients and Other Intended Departures from the scope of this preliminary injunction, the Court emphasizes that it takes no position on the ultimate merit (or lack thereof) of any claim for damages Plaintiffs may bring with respect to the Excepted Clients and Other Intended Departures.

*supersedeas* bond); or September 27, 2018;

3.    To ensure no confusion regarding Other Intended Departures:

  a.    on or before **October 7, 2016**, Plaintiffs shall submit to Defendant a list of those FWCM Clients whom Plaintiffs have determined, in good faith, to be Other Intended Departures;

  b.    on or before **October 14, 2016**, Defendant shall identify for Plaintiffs any individual or entity that Defendant believes, in good faith, should be included as an Other Intended Departure but was not, along with the reasons for Defendant's belief;

  c.    on or before **October 21, 2016**, the parties shall file either (1) an agreed joint list of Other Intended Departures, or (2) a joint notice of their disagreement containing a summary of their respective positions—in which case the Court will establish a procedure for resolving the disagreement; and

4.    Plaintiffs' Motion for Expedited Discovery (ECF No. 14) is DENIED as MOOT.

Dated this 30th day of September, 2016.

BY THE COURT:

William J. Martinez
United States District Judge